**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| SAVESTATION INC. and ACTION FIRST AID INC., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No: 1:26-cv-8693 |
| v. | ) ) ) | |
| MIDAMERICA VENTURES LLC dba SAVEHEART BY HEARTNATION and DAVID FRITZSCHE, | ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants. | ) ) ) | |

## COMPLAINT

SaveStation Inc. ("SaveStation Inc.") and Action First Aid Inc. ("Action First Aid") (hereinafter "Plaintiffs" or "SaveStation"), by their undersigned counsel, brings this action for trademark infringement, unfair competition, trade dress infringement, tortious interference with business relations, and deceptive business practices under Illinois state law, against Defendants MidAmerica Ventures LLC dba SaveHeart by HeartNation ("MidAmerica") and David Fritzsche, an individual domiciled in the state of Illinois, ("Fritzsche") (collectively, the "Defendants" or "SaveHeart"), and allege as follows:

## PRELIMINARY STATEMENT

1. SaveStation is a long-time, well-known provider of critical public safety equipment.

2. In particular, SaveStation was one of the earliest to develop, manufacture and deliver a family of indoor and outdoor housing solutions for automated external defibrillator ("AED") cabinets and other related products and accessories for AEDs, which devices are now routinely installed by towns and cities across North America.

3.      Despite SaveStation's longstanding use of distinctive branding and trade dress, and Defendants' actual knowledge of such, Defendants have deliberately mimicked SaveStation's branding, trade dress and marketing in an attempt to trade upon the hard-earned goodwill created by SaveStation.

4.      This action also involves SaveStation's former contractor, Fritzsche, who was intimately familiar with SaveStation's products and had assisted SaveStation as a distributor and ardent promotor of SaveStation products and services.

5.      At one point, Fritzsche was so convinced of the value and potential of SaveStation Inc., he attempted to purchase it.

6.      But even before that deal fell through, Fritzsche had already created the SaveHeart brand with the intent of directly competing with SaveStation.

7.      That competition would have been welcomed *if* SaveHeart had done so fairly and had not directly copied Plaintiffs' trademarks and trade dress (shown below), thereby trading on SaveStation's hard-earned goodwill.

| Category | Savestation Products | Infringing Products |
|---|---|---|
| Tower | | |
| Standard | | |



| Category | Savestation Products | Infringing Products |
|---|---|---|
| Wall Mount | | |
| Wall Bracket | | |
| Wall Panel | | |

8.    SaveHeart's actions are not accidental or isolated.

9.    They were undertaken with full knowledge and in reckless disregard, if not a premeditated intent, to infringe on SaveStation's rights.

4

10. SaveHeart has diverted customers, diluted SaveStation's distinctive brand identity, and injured SaveStation's ability to control the nature and quality of the goods and services associated with its marks and trade dress.

11. Prior to filing this action, SaveStation in good faith attempted to resolve this dispute without court intervention through pre-suit communications and settlement discussions. Those efforts were unsuccessful, and the parties were unable to reach an amicable resolution, necessitating the filing of this lawsuit.

12. SaveStation thus brings this action to stop Defendant's unauthorized use of SaveStation's longtime, well-recognized and valuable trademark and trade dress, which has caused and is continuing to cause consumer confusion, deception, false affiliation and association, dilution and unfair competition, and, consequently, irreparable harm to SaveStation and its reputation.

13. Accordingly, SaveStation seeks injunctive relief, damages, disgorgement, attorneys' fees, and such other relief as the Court deems just and proper.

## **PARTIES**

14. Plaintiff SaveStation Inc. is a corporation duly organized and incorporated in Ontario, Canada, with a place of business located at 131 Commerce Park Dr Unit L, Barrie, Ontario, L4N 8X1, Canada, and is not a citizen of any state of the United States.

15. Plaintiff Action First Aid Inc. is a corporation duly organized and incorporated in Ontario, Canada, with a place of business located at 131 Commerce Park Dr Unit L, Barrie, Ontario, L4N 8X1, Canada, and is not a citizen of any state of the United States.

16. Defendant MidAmerica Ventures LLC is, upon information and belief, a limited liability company duly organized and existing under the laws of Illinois, with a place of business located at 33 Locust Road Winnetka, Illinois 60093.

17. Defendant, David Fritzsche is, upon information and belief, a U.S. citizen and resident of the State of Illinois at 33 Locust Road Winnetka, Illinois 60093.

## NATURE OF ACTION

18. Plaintiffs assert both Federal and State causes of action based on Defendants' actions as follows: (1) Trade Dress Infringement Under 15 U.S.C. § 1125(a); (2) Trademark Infringement Under 15 USCS § 1114; (3) Unfair Competition and False Designation of Origin Under 15 U.S.C. § 1125(a); (4) Illinois State Common Law Trademark and Trade Dress Infringement; (5) Deceptive Trade Practices Under 815 I.L.C.S. § 510; and (6) Tortious Interference.

## JURISDICTION AND VENUE

19. This Court has original jurisdiction over Counts One, Two, and Three brought under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, pursuant to 28 U.S.C. §§ 1331 (actions arising under the laws of the United States) and 1338(a) (actions arising under an Act of Congress relating to copyrights and trademarks).

20. This Court has supplemental jurisdiction over Count Four (Illinois common law for trademark and trade dress infringement), Count Five (deceptive trade practices under 815 ILCS § 510), and Count Six (tortious interference) pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

21. This Court has personal jurisdiction over Defendants because MidAmerica is an Illinois Company, Fritzsche is a resident of the State of Illinois, and they have committed acts of trademark infringement, trade dress infringement and/or unfair competition within this District, and/or, upon information and belief, their acts or omissions have caused damage within this

6

District, and/or they engage in business transactions and solicitations in the State of Illinois and within this District and have offered to contract, and/or contracted, to supply goods and services within this District. Further, MidAmerica is organized and maintains its principal place of business in Illinois, Fritzche resides in and conducts business from Illinois, SaveHeart's website is accessible to consumers in Illinois and targets Illinois consumers and, on information and belief, SaveHeart advertised, offered for sale, and sold infringing products to customers in Illinois and throughout the United States via their website and other channels of commerce.

22. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to SaveStation' claims against Defendants occurred, and continue to occur, within this District. For example, Defendants are domiciled in the Northern District of Illinois, and, on information and belief, Defendants' website and business operations are conducted from this District, customers in this District have purchased infringing products resulting in harm within the District, and Defendants manufactured, marketed, and sold the infringing products from their place of business located within this District.

## SALIENT FACTS/BACKGROUND

23. Since 2016, SaveStation has been in the business of providing, developing, manufacturing, advertising, promoting and selling emergency life-saving equipment, namely, AED cabinets, including standard outdoor AED cabinets, outdoor AED wall mounts, outdoor towers, indoor cases, indoor cabinets, indoor alarm cabinets, mobile cases, stickers, decals, signs, and other related products and accessories (collectively, "SaveStation Products").

24. Plaintiffs SaveStation Inc. and Action First Aid are related companies operated by the same founders, namely Deb Hennig and Roger Hennig.

25. Plaintiffs SaveStation Inc. and Action First Aid are owned in common and each have a stake in the ownership and licensing of the intellectual property.

## THE SAVESTATION TRADE DRESS

26. SaveStation has developed, offered for sale and sold in interstate commerce an aesthetically pleasing ornamental trade dress for SaveStation Products that sets SaveStation apart from its competition. This distinctive design includes a unique combination of words, colors, color placement, branding, including the Mark (defined below) and Logo (defined below), and associated shapes and elements on the cabinets. For example, SaveStation's trade dress for the outdoor AED tower products consists of a unique combination of nonfunctional elements including: the Logo (defined below); a red cap striping feature at the top of the tower with the Logo (defined below) on said feature; a combination of red and white coloring on the device with white being used for the entirety of the base other than the AED cabinet, which is red; the design and placement of a "Public Access Defibrillator" sticker just below the red cap of the tower; a uniquely aesthetically pleasing shaped custom sticker at the front of the AED cabinet; a curved, red, translucent AED cabinet with a design of a heart with a sinus rhythm and a curvilinear custom cabinet sticker; and a tapered base of the tower ("SS Tower Trade Dress").

27. Below is an example of a SaveStation Product showing SaveStation's use of its highly distinctive SS Tower Trade Dress:

8



28.     SaveStation's SS Tower Trade Dress is unique, distinctive and signifies the source of SaveStation's tower products.

29.     Another example of SaveStation's unique trade dress can be seen in its design and look and feel of its standard cabinet.  SaveStation's trade dress for the outdoor standard AED cabinet consists of a unique combination of non-functional elements, including, for example, the distinctive Logo (defined below); a red striping feature at the top of the standard cabinet featuring the Mark (defined below) on the red stripe; a combination of red and white coloring on the device with white being used for the entirety of the base other than the AED cabinet which is red; shelving space for the AED cabinet; the design and placement of a Public Access Defibrillator sticker just above the translucent AED cabinet, a uniquely shaped custom sticker at the front of the AED

9

cabinet; and a curved, red, translucent AED cabinet with a design of a heart with a sinus rhythm and a curvilinear custom cabinet sticker ("SS Standard Cabinet Trade Dress").

30. Below is an example of a SaveStation Product showing SaveStation's use of its highly distinctive SS Standard Cabinet Trade Dress:



31. SaveStation's unique trade dress can also be seen in its design and look and feel of its wall mount cabinet. SaveStation's trade dress for the outdoor wall mount consists of a unique combination of non-functional elements, including, for example, the distinctive Logo (defined below); a red striping feature at the top of the wall mount featuring the Mark (defined below) on the red stripe; a combination of red and white coloring on the device with white being used for the entirety of the base other than the AED cabinet which is red; the design and placement of a Public Access Defibrillator sticker just above the translucent AED cabinet, a uniquely shaped custom sticker at the front of the AED cabinet; and a curved, red, translucent AED cabinet with a design

of a heart with a sinus rhythm and a curvilinear custom cabinet sticker ("SS Wall Mount Trade Dress").

32.  Below is an example of a SaveStation Product showing SaveStation's use of its highly distinctive SS Wall Mount Trade Dress:



33.  SaveStation's SS Standard Cabinet Trade Dress, SS Standard Cabinet Trade Dress, and SS Wall Mount Trade Dress are the look and feel of widely recognizable products that identify and signify the source of the SaveStation Products.

34.  SaveStation's SS Standard Cabinet Trade Dress, SS Standard Cabinet Trade Dress, and SS Wall Mount Trade Dress (collectively, "SaveStation Trade Dress"), through their combination of distinct trade dress features, including their placement of the Mark (defined below) on the SaveStation Products, are creative and non-functional.

35.  The SaveStation Trade Dress is the product of hundreds of hours of design and redesign work. The company spent at least four hundred thousand dollars ($400,000) designing and redesigning the units to ensure their features were unique and distinctive.

11

36.     SaveStation has marketed and sold the SaveStation Products using the SaveStation Trade Dress throughout the United States, including in the State of Illinois, since at least June 2018.

37.     Consumers of AED products recognize and associate the SaveStation Trade Dress uniquely with SaveStation.

38.     Other purveyors of emergency AED equipment do not commonly use the SaveStation Trade Dress. Examples of third-party AED equipment appear at Exhibit 1.  Below are two tables comparing SaveStation products utilizing the SaveStation Trade Dress with those of other third parties selling competing products.

**Table 1**



**Table 2**

| Savestation | Saveheart | Smartcase SC1230 Outdoor Cabinet |
|---|---|---|
| | | |
| **Sixcase SC1430 Outdoor Defibrillator Polar Cabinet** | **Claus Andersen outdoor defibrillator cabinet** | **Life Safety Station** |
| | | |

## THE SAVESTATION TRADEMARK

39. Since at least as early as June 2018, SaveStation has used the mark SAVESTATION® (the "Mark") on the SaveStation Products.

40. The SaveStation logo is comprised of the word SAVESTATION combined with the design of a heart with a sinus rhythm (the "Logo"), as shown below:



41. The Mark is registered on the Principal Register of the U.S. Patent and Trademark Office, U.S. Reg. No. 5683020, for use in connection with "[c]abinets specially designed to store

and provide access to emergency life-saving equipment, namely, automated external defibrillators" in International Class 10 (the "Registration").

42. The application to register the Mark was filed on April 12, 2017, the Registration issued on February 26, 2019, and the Mark is now incontestable. Attached at Exhibit 2 is a true and correct copy of the certificate of the Registration and a printout from the United States Patent and Trademark Office electronic database showing the current status and the title of the Registration.

43. The Mark has been in continuous use and is in current use as evidenced by the below screen capture of SaveStation's website taken July 20, 2026. *See* SaveStation's website at https://savestation.ca/about/ at Exhibit 3.



44. Since at least June 2018, SaveStation has devoted considerable resources to developing the SaveStation Trade Dress and the Mark by actively marketing, promoting, distributing and selling the SaveStation Products throughout the United States, with such activities featuring the SaveStation Trade Dress and the Mark.

45. SaveStation garners unsolicited recognition from various third parties, including major media outlets, national health organizations and customers, about the high-quality of the SaveStation Products. *See* various examples of third party articles, press coverage, testimonials and statements about SaveStation and SaveStation Products: Exhibit 4 ("Product of the Year Award"), Exhibit 5 (Statements from U.S. Rep. Rob Menendez), Exhibit 6 (news article about SaveStation and public safety organization Cardiac on Campus), Exhibit 7 (news article about SaveStation and foundation), and Exhibit 8 (SaveStation's videos with third parties regarding SaveStation Products).

46. SaveStation has built and developed its brand among the consuming public by spending significant time, effort, and resources establishing the Mark and SaveStation Trade Dress in the minds of its customers and the public via advertisements, educational programs and promotions, physical and digital branding, robust social media presence, design, and marketing materials and initiatives associated with its AED storage and access systems, including its "24/7 AED Access, Awareness" messaging, website and visual presentation (collectively, the "SaveStation Marketing IP"). *See* various examples of SaveStation's marketing and advertising materials: Exhibit 9 for printouts from SaveStation's Youtube webpage, Exhibit 10 for printouts from SaveStation's Facebook webpage, Exhibit 11 for printouts from SaveStation's Instagram webpage.

47. Because of the strong media presence bolstered by the SaveStation Marketing IP and the quality of the SaveStation Products, SaveStation has established a strong reputation for providing high-quality AED solutions in the United States.

48. In particular, since 2018, SaveStation has spent in excess of four hundred and fifty thousand dollars ($450,000) on marketing and promoting the SaveStation Products bearing the Mark and the SaveStation Trade Dress.

49. Since 2018, SaveStation has generated substantial revenue – at least three million dollars ($ 3,000,000) – from its sales of SaveStation Products bearing the Mark and the SaveStation Trade Dress.

50. As a result of SaveStation's continuous use, extensive sales, advertising and promotion, the SaveStation Trade Dress and the Mark have acquired widespread recognition and a reputation that is recognized by the public as emanating solely from SaveStation.

51. The Mark, the SaveStation Trade Dress, and the SaveStation Marketing IP have been exclusively owned, maintained and controlled by SaveStation and have been exclusively used by or on behalf of SaveStation.

52. As a result of SaveStation's efforts and commercial success in advertising, marketing and promoting the SaveStation Products, the Mark and SaveStation Trade Dress have become intangible assets of substantial commercial value to SaveStation.

**DEFENDANTS' INFRINGING ACTIVITIES**

53. On or about January 24, 2020, SaveStation engaged MidAmerica's founder, Fritzsche, as a paid independent advisor to SaveStation.

54. Mr. Fritzsche's role at SaveStation during this time was managerial, helping lead various operational, business development, sales, marketing and human resources activities, as jointly agreed upon with SaveStation.

16

55. On information and belief, Fritzsche was given and/or had access to SaveStation's confidential information consisting of business leads and contact data derived uniquely from SaveStation's efforts, research, advertising and promoting of its products ("SaveStation Leads").

56. On information and belief, Fritzsche knew that the SaveStation Leads were confidential and proprietary information belonging to SaveStation.

57. On December 9, 2021, Fritzsche separated from SaveStation as an independent advisor, but continued to represent SaveStation by promoting and selling the SaveStation Products in the United States.

58. Unbeknownst to SaveStation, on June 8, 2022, MidAmerica filed an intent-to-use trademark application for the trademark SAVEHEART ("Infringing Mark") for use with "[c]abinets specifically designed to store and provide access to emergency life-saving equipment, namely, automated external defibrillators" in class 10. *See* Exhibit 12, USPTO Records for SaveHeart demonstrating MidAmerica's trademark filing and asserted date of first use of the Infringing Mark.

59. In or around September 2022, after separation from SaveStation, Fritzsche offered to purchase SaveStation Inc. but SaveStation Inc. declined that offer.

60. On or about June 1, 2023, SaveStation became aware that SaveHeart had begun marketing, promoting, advertising, offering, distributing, and selling AED cabinet products under the Infringing Mark ("Infringing Products"), using a name and product design that is confusingly similar to the Mark and SaveStation Trade Dress. Fritzsche, and by extension, MidAmerica, was fully aware of SaveStation's rights to the Mark and the SaveStation Trade Dress prior to their alleged first use of the Infringing Mark in June of 2023.

61. The Infringing Mark is confusingly similar to the Mark.

17

62.     The design, style and appearance of the Infringing Products offered and sold by SaveHeart is identical or nearly identical to the SaveStation Trade Dress. *See* Exhibit 13 for printouts from SaveHeart's website, accessed on April 29, 2024 (page 6 of 7 of printouts, intentionally omitting blank page 1) and pages 3-5 of Exhibit 14 for SaveHeart's brochure featuring the Infringing Products.



18

63. SaveHeart's stylized design of the Infringing Mark copies various distinct elements of the Logo, including the font, the color and incorporation of a design of a heart with a sinus rhythm in the middle. A comparison of the stylized design marks is shown below:



64. SaveHeart's Infringing Products feature similar, if not the same, look and feel, resulting from similar combinations of non-functional elements, including, for example, the same red cap striping at the top featuring a trademark, the same red and white color combination with white base and red cabinet, similar placement of a Public Access Defibrillator sticker below the red cap, a similar uniquely shaped custom sticker at the front of the cabinet, a curved ornamental red translucent AED cabinet with the same design of a heart with a vertically positioned sinus rhythm and a similar sticker design, and a tapered base ("Infringing Trade Dress").

65. The similarities between the SaveStation Trade Dress and the Infringing Trade Dress are not merely incidental. Indeed, the Infringing Trade Dress replicates the overall look and feel of SaveStation's distinctive product line and the SaveStation Trade Dress. See Exhibit 1 for comparison of the products.

66. Put simply, the SaveStation Trade Dress and Infringing Trade Dress have the same following elements:

- Same color configuration
- Same dimensions and sizing

19

- Similar confusingly similar trademark
- Same trademark placement
- Same heart with sinus rhythm design
- Same sticker placement.

67. As a result of SaveHeart's intentionally designed overlapping trade dress and branding choices, a consumer encountering the SaveHeart Infringing Products in the market is likely to mistakenly believe they are viewing SaveStation Products and/or that the Infringing Products are sourced from or are associated with SaveStation.

68. Saveheart's infringing activities are deliberately and knowingly exacerbated by their flagrant copying of the look and feel of SaveStation's marketing style and technique. By way of example, see the below side by side depiction of SaveStation's website against SaveHeart's website. *See* Exhibit 15 for screen captures, accessed from https://savestation.ca/ and https://saveheart.life/ on July 20, 2026.



69. On information and belief, SaveHeart used the SaveStation Leads to its advantage and/or to the advantage of SaveHeart, namely, by actively marketing and promoting competing Infringing Products to SaveStation Leads, including SaveStation Leads with various entities in Talbot County, Maryland and Paso Robles, California.

70. On information and belief, SaveStation lost and continues to lose sales to many customers who were SaveStation Leads because SaveHeart interfered with the relationship by marketing and promoting competing products.

71. On information and belief, SaveStation lost and continues to lose sales to customers who were SaveStation Leads because customers believed they were acquiring a SaveStation Product but subsequently received an Infringing Product.

72. The bad acts of SaveHeart in the use of similar marks and trade dress have caused actual consumer confusion, as discussed in more detail below.

73. While attempting to purchase SaveStation Inc. and its assets, Defendants were concurrently preparing to compete and design a product with a similar trademark and trade dress, even adopting similar promotions and materials as SaveStation.

74. Defendants even went behind Plaintiffs' back during negotiations to purchase a product directly from Plaintiffs' suppliers.

75. In or around April 2023, a founder and executive director of a prominent health organization mistakenly purchased a SaveHeart Product while trying to purchase a SaveStation Product after being helped by Fritzsche.

76. Seeking to defend their trademark rights, on December 26, 2023, SaveStation's counsel mailed a demand letter to SaveHeart (the "Demand Letter"), to the attention of Mr. David Fritzsche, Founder and CEO, demanding SaveHeart cease its use of the Mark and SaveStation Trade Dress. A copy of the Demand Letter is attached as Exhibit 16.

77. Even after being put on notice of SaveHeart's infringement of the Mark and the SaveStation Trade Dress, SaveHeart failed to cease its misappropriation of SaveStation's intellectual property.

21

78. This has resulted in numerous additional instances of actual confusion among the consuming public.

79. After sending the Demand Letter, the parties exchanged correspondence and discussed a potential resolution of the matter, but the parties were unable to come to an agreement.

80. On January 22, 2025, SaveStation filed a petition to cancel MidAmerica's registration of the Infringing Mark through the Trademark Trial and Appeal Board. That case is pending but will be suspended pending the resolution of this proceeding.

81. Despite being apprised of its actions, SaveHeart continues to willfully infringe upon the Mark and the SaveStation Trade Dress.

82. Upon information and belief, SaveHeart's actions are knowing and willful and intended to wrongfully appropriate the reputation and good will of SaveStation by using a similar trademark and nearly identical trade dress to market identical products to the consuming public.

83. SaveStation's customer data, including the names and contact details of customers, purchasers, and prospects, comprises proprietary and confidential trade secrets.

84. Fritzsche worked directly with SaveStation products for nearly two years.

85. SaveHeart had direct knowledge of the confidential nature of SaveStation's marketing information, and consumer database.

86. Despite this knowledge, SaveHeart took SaveStation's unique design specifications and created identical competing devices without SaveStation's authorization.

87. MidAmerica intentionally infringed SaveStation's distinctive and well recognized Mark by, among other things, filing a trademark application with the U.S. Patent and Trademark Office and asserting ownership of, and attempting to register, the Infringing Mark.

22

88. Fritzsche offered to buy SaveStation Inc. after filing the trademark application for the Infringing Mark.

89. SaveHeart continued to promote and sell the Infringing Products after being informed by SaveStation Inc. in the Demand Letter that its actions were knowing and willful.

90. SaveHeart's actions demonstrate a pattern of deliberate copying, and not independent creation.

91. Upon information and belief, SaveHeart has unfairly benefitted from customers believing they are selecting SaveStation Products when in fact they are selecting SaveHeart's Infringing Products.

92. SaveHeart's actions, taken alone or in total, demonstrate deceptive trade practices and unfair competition, and should be enjoined.

## CLAIMS FOR RELIEF

### COUNT I – FEDERAL TRADE DRESS INFRIGNMENT UNDER 15 U.S.C. § 1125(a)

93. SaveStation repeats and re-alleges the preceding paragraphs as if fully set forth herein.

94. The SaveStation Trade Dress has acquired secondary meaning through SaveStation's extensive and continuous use, substantial advertising and promotion, significant sales, widespread media coverage, and recognition by consumers in the AED cabinet market as indicating the source of the products.

95. The Infringing Products manufactured, imported, distributed, advertised, offered for sale, and/or sold by SaveHeart are confusingly similar to the SaveStation Trade Dress, and have and are likely to continue to cause confusion as to the source, sponsorship, affiliation with or approval by SaveStation of the Infringing Products.

96. SaveHeart's unlawful use of the SaveStation Trade Dress is without SaveStation's permission or authorization, and in total disregard of SaveStation's rights to control its intellectual property.

97. The SaveStation Trade Dress is nonfunctional.

98. There are numerous other AED cabinet manufacturers and suppliers in the AED solution industry that do not use the SaveStation Trade Dress, demonstrating that alternate designs are possible.

99. SaveHeart's use of the SaveStation Trade Dress is likely to result, and has resulted, in confusion, mistake, or deception, and is likely to cause, or has caused, the public to believe that Infringing Products are produced, sponsored, authorized, or licensed by or are otherwise connected or affiliated with SaveStation.

100. SaveHeart's adoption of the SaveStation Trade Dress was knowing, deliberate, willful, and intended to cause consumers to believe that SaveHeart's Infringing Products are sourced from SaveStation.

101. As a direct and proximate result of the foregoing acts, SaveStation has suffered and will continue to suffer significant injuries in an amount to be determined at trial.

102. SaveHeart's acts and omissions are so egregious as to constitute an exceptional case.

103. SaveStation is thus entitled to recover all damages, including attorneys' fees, that it has sustained and will sustain, and all gains, profits and advantages obtained by SaveHeart as a result of its infringing acts.

104. Furthermore, unless SaveHeart's unlawful acts are enjoined by this Court, there is no adequate remedy at law that can fully compensate SaveStation for the harm caused by Defendants' infringement, which is ongoing.

105. Accordingly, SaveStation is entitled to injunctive relief prohibiting SaveHeart from continuing to infringe the SaveStation Trade Dress, or any designs confusingly similar thereto.

## COUNT II – FEDERAL  TRADE MARK INFRINGEMENT

106. SaveHeart, without SaveStation's consent, has used and continues to unlawfully use in commerce, the mark SAVEHEART in connection with the sale, offering for sale, distribution, and advertising of products similar to the SaveStation Products, i.e., cabinets designed to store and provide access to AED devices.

107. SaveHeart was fully aware of SaveStation's rights to the Mark prior to its alleged first use of the SAVEHEART Mark in June 2023.

108. The mark SAVEHEART is confusingly similar in appearance to the registered "SAVESTATION" Mark, utilizing the same prefix "SAVE," sound, and commercial impression.

109. Both marks are used in connection with identical goods, namely, cabinets specially designed to store and provide access to automated external defibrillators.

110. SaveHeart's use of the SAVEHEART Infringing Mark in connection with Infringing Products is likely to cause confusion, mistake, and affiliation with, or deception as to the source, sponsorship, or approval of SaveHeart's Infringing Products.

111. SaveHeart and SaveStation operate in the same marketplace, serve the same class of customers, and use the same channels of trade.

112. SaveStation has documented instances of actual confusion, which demonstrate a likelihood of confusion among consumers as to the source, sponsorship, or affiliation of the products.

113. SaveHeart's use of the SAVEHEART Infringing Mark constitutes infringement of SaveStation's federally registered "SAVESTATION" Mark in violation of 15 U.S.C. § 1114(1)(a).

114. SaveHeart's acts of infringement have been knowing, deliberate, and willful, and were undertaken with full knowledge of SaveStation's rights in the SAVESTATION mark.

115. As a direct and proximate result of SaveHeart's trademark infringement, SaveStation has suffered and will continue to suffer irreparable injury to its business reputation, loss of goodwill, loss of control over the nature and quality of goods associated with the Mark, and loss of income and profits.

116. SaveHeart has been unjustly enriched by profits derived from its infringing use of the SAVEHEART mark.

117. SaveStation is entitled to recover SaveHeart's profits, and actual damages, pursuant to 15 U.S.C. § 1114(1).

118. SaveHeart's willful, deliberate, and bad-faith infringement renders this an exceptional case under 15 U.S.C. § 1117(a), entitling Plaintiffs to recover its reasonable attorneys' fees and costs.

119. SaveStation has no adequate remedy at law, and unless SaveHeart is enjoined from further infringing use of the SAVESTATION mark pursuant to 15 U.S.C. § 1116(a), SaveStation will continue to suffer irreparable harm.

## COUNT III – UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125(A)

120. SaveStation repeats and re-alleges the preceding paragraphs as if fully set forth herein.

121. By misappropriating and using SaveStation's distinctive SaveStation Trade Dress in commerce, SaveHeart misrepresents and falsely describes to the general public the origin and

26

source of the infringing goods and creates a likelihood of confusion by purchasers as to the source of the Infringing Products.

122. SaveHeart's unauthorized and unlicensed manufacturing, advertising, distributing, offering for sale, and sale of the infringing goods in interstate commerce creates express and implied misrepresentations that those goods were created, authorized, or approved by SaveStation, causing damage to both SaveStation and the public but contributing to SaveHeart's profit.

123. Upon information and belief, SaveHeart has manufactured, distributed, advertised, sold, and offered its infringing goods for sale in interstate commerce using the SaveStation Trade Dress with the intention of misleading, deceiving, or confusing consumers as to the origin of its goods and of trading on SaveStation's reputation and goodwill.

124. SaveHeart's unauthorized marketing and sale of the infringing goods in interstate commerce using the SaveStation Trade Dress constitutes a use of a false designation of origin or false representation that wrongfully and falsely designates SaveHeart's Infringing Products as originating from or connected with SaveStation, in violation of 15 U.S.C. § 1125(a).

125. As a direct and proximate result of SaveHeart's acts of unfair competition, SaveStation has suffered and will continue to suffer irreparable loss of income, profits and goodwill and SaveHeart has unfairly acquired and will continue to unfairly acquire income, profits and goodwill.

126. SaveHeart's acts of unfair competition will cause further irreparable injury to SaveStation if SaveHeart is not restrained by this Court from further violation of SaveStation's rights.

127.    SaveStation has no adequate remedy at law, and unless SaveHeart is enjoined from further infringing use of the Mark and the SaveStation Trade Dress, SaveStation will continue to suffer irreparable harm.

## COUNT IV - COMMON LAW TRADEMARK AND TRADE DRESS INFRINGEMENT

128.    SaveStation repeats and re-alleges the preceding paragraphs as if fully set forth herein.

129.    SaveStation has used its distinctive Mark and SaveStation Trade Dress for its AED cabinetry solutions in interstate commerce continuously since June 2018.

130.    SaveStation has invested substantial time, effort and financial resources promoting the SaveStation Trade Dress and Mark in connection with the marketing and sale of its AED cabinet products in interstate commerce.

131.    The SaveStation Trade Dress and Mark have acquired secondary meaning through SaveStation's extensive and continuous use, substantial advertising and promotion, significant sales, widespread media coverage, and recognition by consumers in the AED cabinet market as indicating the source of the products.

132.    The SaveStation Trade Dress is nonfunctional.

133.    The Mark and SaveStation Trade Dress have secondary meaning in the marketplace and have become widely attributed and associated with and to SaveStation prior to SaveHeart's use of the name SaveHeart in its marketing and advertising.

134.    SaveHeart manufactures, distributes, advertises, offers for sale, or sells AED cabinet solutions, using a trade dress that is identical to or substantially similar to SaveStation's Trade Dress.

135. SaveStation did not authorize or license use of its distinctive SaveStation Trade Dress or Mark on or in connection with the Infringing Products.

136. SaveHeart has manufactured, distributed, advertised, sold, and offered the Infringing Products for sale using the SaveStation Trade Dress with the intention of misleading, deceiving, or confusing consumers as to the origin of its AED cabinet solutions and with the intention to trade on SaveStation's reputation and goodwill.

137. SaveHeart's use has created a misplaced association between SaveHeart and the Mark, causing customers and the general public to wrongfully associate and confuse SaveHeart with the Mark.

138. As a direct and proximate result of SaveHeart's trade dress and trademark infringement, SaveStation has suffered and will continue to suffer irreparable loss of income, profits, and goodwill and SaveHeart has unfairly acquired and will continue to unfairly acquire income, profits, and goodwill.

139. SaveHeart's acts of trade dress and trademark infringement will cause further irreparable injury to SaveStation if SaveHeart is not restrained by this Court from further violation of SaveStation's intellectual property rights in its Mark and the SaveStation Trade Dress.

140. As a result, SaveStation is entitled to an injunction against Defendants' further use of the SaveHeart Infringing Mark and the SaveStation Trade Dress.

**COUNT V – DECEPTIVE TRADE PRACTICES UNDER 815 I.L.C.S. § 510**

141. SaveStation repeats and re-alleges the preceding paragraphs as if fully set forth herein.

142. SaveHeart has and is engaged in willfully deceptive trade practices and caused damage to SaveStation.

29

143. SaveHeart has and is passing off SaveStation's product design, namely the Infringing Products, as its own.

144. SaveHeart's actions have caused and will cause a likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of the Infringing Products.

145. SaveHeart's actions have caused and will cause a likelihood of confusion or misunderstanding as to the affiliation, connection or association with, or certification by, SaveStation.

146. SaveHeart has used and is using deceptive representations and/or false designations of origin in connection with the SaveStation Products.

147. SaveHeart falsely claimed and continues to claim that it created and owns the right to the Infringing Mark and, in so doing, disparages SaveStation.

148. SaveStation is entitled to judgment against Defendants on the Fifth Cause of Action, granting among other relief to be determined trial, an award of actual damages, and reasonable attorneys' fees and costs.

## COUNT VI – TORTIOUS INTERFERANCE WITH CONTRACT AND PROSPECTIVE BUSINESS RELATIONSHIPS

149. SaveStation repeats and re-alleges the preceding paragraphs as if fully set forth herein.

150. SaveStation has spent considerable time, effort, and money in marketing the SaveStation Products, and building consumer goodwill for its business and reputation in association with the Mark and SaveStation Trade Dress.

151. SaveStation had and continues to have reasonable expectations of entering into valid business relationships with prospective customers seeking to purchase AED cabinet solutions.

152. SaveHeart had knowledge of SaveStation's actual contracts and business relationships in addition to SaveStation's expectancy of business relationships with prospective customers in the AED cabinet market.

153. Defendant Fritzsche served as a paid independent advisor to SaveStation from January 24, 2020 until December 9, 2021, and thereafter continued to represent SaveStation by promoting and selling SaveStation Products.

154. Through his role with SaveStation, Mr. Fritzsche gained direct knowledge of SaveStation's customer data, including the names and contact details of customers, purchasers, and prospects.

155. Defendants intentionally and unjustifiably interfered with SaveStation's prospective business relationships by adopting the confusingly similar SAVEHEART mark and by using SaveStation's proprietary design specifications to create identical competing devices without authorization.

156. Defendants used the SaveStation Leads to their advantage by actively marketing and promoting competing Infringing Products to SaveStation Leads.

157. While committing the wrongful acts described above, Defendants knew and fully intended that SaveStation would lose its existing sales revenues.

158. Defendants, while misleading SaveStation to falsely believe that Fritzsche was actively working in good faith to promote, market, and sell SaveStation Products, were in fact promoting, marketing, and selling the Infringing Products.

159. Defendants' interference prevented and continues to prevent SaveStation's legitimate expectancy from ripening into valid business relationships with prospective customers.

160. Defendants' interference was intentional, unjustified, and undertaken with full knowledge of SaveStation's rights and business relationships, for the improper purpose of misappropriating SaveStation's reputation, goodwill, and customer relationships.

161. As a direct and proximate result of Defendants' tortious interference, SaveStation has suffered and will continue to suffer damages, including loss of prospective business relationships, loss of income, loss of profits, and injury to its business reputation and goodwill.

162. Defendants have been unjustly enriched by customers and profits diverted from SaveStation as a result of Defendants' tortious interference.

163. SaveStation seeks recovery of its actual, direct and consequential damages and lost profits caused by Defendants' tortious interference through unauthorized use of the Mark and the SaveStation Trade Dress.

164. SaveStation also seeks recovery of, and requests that Defendants disgorge, all profits derived from Defendants' sales of the Infringing Products. SaveStation further seeks punitive damages for the willful and malicious acts of tortious interference by SaveHeart.

## PRAYER FOR RELIEF

**WHEREFORE**, SaveStation respectfully asks this Court to:

A. Enter judgment that Defendants' acts constitute trademark infringement, false designation of origin, and unfair competition, under the Lanham Act, 15 U.S.C. §§1125(a)(1)(A), and 1114(1);

B. That Defendants' acts, conduct, and use of the SaveStation Trade Dress constitute infringement, false designation of origin, unfair competition, and related violations of law 15 U.S.C. §§1125(a)(1)(A);

C. That Defendants have infringed on the common law trademark and trade dress rights of SaveStation;

D. Under 15 U.S.C. § 1116, that Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them, be temporarily, preliminarily, and permanently enjoined and restrained from:

(a) manufacturing, distributing, offering for sale, selling, and importing into the United States any product, including the Infringing Products, bearing false designations of origin, false descriptions, or misleading representations of fact that are likely to cause confusion with SaveStation, the Mark, or SaveStation Trade Dress;

(b) manufacturing, distributing, offering for sale, selling, and importing into the United States any product, including the Infringing Products, that misrepresents its source, sponsorship, or affiliation with SaveStation, the Mark, or SaveStation Trade Dress;

(c) aiding, abetting, contributing to, or otherwise assisting anyone in the acts described in Subparagraphs (a) or (b); and;

(d) effecting assignments or transfers, forming new entities or associations, or utilizing any other device to circumvent or otherwise avoid the prohibitions set forth in Subparagraphs (a) and (b);

E. That Defendants deliver up for destruction or impoundment all products, labels, packaging, advertising, and digital content bearing the infringing Mark and SaveStation Trade Dress;

F. That SaveStation be awarded permanent injunctive relief against Defendants to prevent further false designation of origin, confusingly similar goods, and use of SaveStation's brand, images, symbols, or graphics, or trade dress, pursuant to 15 U.S.C. §§ 1116(a) and 1125(a),;

G. That SaveStation be awarded Defendants' profits, and SaveStation's actual damages for Defendants' violations of the Lanham Act pursuant to 15 U.S.C. § 1117(a), and, in the case of willful infringement, disgorgement of profits, enhanced or treble damages, increased profits, and such damages as permitted by law, together with reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1117(a).

H. That SaveStation be awarded damages for corrective advertising pursuant to 15 U.S.C. § 1117(a), including the cost necessary to counteract the public confusion resulting from Defendants' violations of the Lanham act and to restore SaveStation to the position it occupied before Defendants' wrongful conduct, in an amount to be proven at trial;

I. Determine that Defendants have willfully engaged in deceptive trade practices within the meaning of the Illinois Uniform Deceptive Trade Practices Act and that Defendant is liable for such willful violations;

J. Determine that Defendants have willfully engaged in willful and malicious acts of tortious interference and that Defendant is liable for such willful violations;

K. Enjoin Defendants, their officers, directors, agents, employees, attorneys, successors, and assigns, and all other in active concert or participation with any of them, from directly or indirectly engaging in any further deceptive business practices, interference, or trademark and trade dress infringement;

L. That SaveStation be awarded restitution, disgorgement of profits, and any other equitable relief necessary to remedy Defendants' unearned profits as a result of their unlawful acts,

34

deceptive business practices and tortious interference, and, to the extent permitted by law, attorneys' fees and damages for willful and egregious misconduct;

M.      That SaveSatation be awarded pre- and post-judgment interest on all monetary awards to the fullest extent permitted by law;

N.      That SaveStation be awarded all costs and expenses of this action, including filing fees, expert fees, and other litigation-related costs, in addition to any attorneys' fees;

O.      That SaveStation be granted any and all other remedies available at law or equity to fully compensate SaveStation for Defendants' wrongful acts, infringement of its intellectual property, and to prevent future infringement or unfair competition.

P.      That SaveStation be awarded any and all other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, SaveStation demands a trial by jury on all issues present in this civil action.

Dated: July 22, 2026                          BARCLAY DAMON LLP

/s/ Michael A. Dorfman
Michael Dorfman
Illinois Bar No. 6255860
1742 N St NW #1,
Washington, DC 20036
Tel: (202) 689-1906
Email: mdorfman@barclaydamon.com

Michael A. Oropallo (*pending pro hac vice*)
New York Bar No. 505267
125 E. Jefferson Street
Syracuse, NY 13202
Tel: 315-425-2831
Email: moropallo@barclaydamon.com

*Attorneys for SaveStation Inc. and Action First Aid Inc.*

35